**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

ALBERT TALONE, D.O., CRAIG
WAX, D.O., RICHARD RENZA,
D.O., ROY STOLLER, D.O.,
individually and on behalf of
all others similarly
situated,

        Plaintiffs,

    v.

THE AMERICAN OSTEOPATHIC
ASSOCIATION,

        Defendant.

1:16-cv-04644-NLH-JS

**OPINION**

---

**APPEARANCES**:

JAMES GREENBERG
DUANE MORRIS LLP
1940 ROUTE 70 EAST
SUITE 200
CHERRY HILL, NJ 08003

WAYNE A. MACK
SETH A. GOLDBERG
DUANE MORRIS LLP
30 SOUTH 17TH STREET
PHILADELPHIA, PA 19103

    *On behalf of Plaintiffs*

JACK R. BIERIG
STEVEN J. HOROWITZ
DAVID GEIGER
NEIL G. NANDI
SIDLEY AUSTIN LLP
ONE SOUTH DEARBORN STREET
CHICAGO, ILLINOIS 60603

JEFFREY W. LORELL
JEFFREY S. SOOS

SAIBER LLC
18 COLUMBIA TURNPIKE, SUITE 200
FLORHAM PARK, NEW JERSEY 07932

*On behalf of Defendant*

MARK BRNOVICH, ATTORNEY GENERAL
DREW C. ENSIGN, ASSISTANT ATTORNEY GENERAL
OFFICE OF THE ARIZONA
ATTORNEY GENERAL
2005 NORTH CENTRAL AVENUE
PHOENIX, ARIZONA 85004

*As Amici Curiae for the Attorneys General of Arizona, Idaho, Louisiana, Rhode Island, and Texas*

SCOTT B. GALLA
CLARK HILL PLC
ONE COMMERCE SQUARE
2005 MARKET STREET
SUITE 1000
PHILADELPHIA, PA 19103

*Local counsel for Amici Counsel*

**HILLMAN**, **District Judge**

This case concerns antitrust and fraud claims brought by osteopathic physicians against the American Osteopathic Association for its alleged unlawful tying of board certification with membership in a professional association. Presently before the Court is the parties' joint Motion for Final Approval of Certification of Settlement Class and Sub-Classes and Class Settlement. Also pending is Plaintiffs' Motion for Attorneys' Fees and Service Awards. For the reasons expressed below, both motions will be granted.

## BACKGROUND

Plaintiffs' complaint relates the following:[1]  Plaintiffs are osteopathic physicians ("DOs") who have been board certified as medical specialists by the American Osteopathic Association ("AOA"), and who have also purchased membership in the AOA. Approximately 48,000 practicing DOs are members of the AOA, and approximately 32,000 of those DOs are AOA board certified.  The AOA has notified Plaintiffs and AOA board certified DOs that their board certification will be invalidated and cancelled unless they purchase annual membership in the AOA.  Plaintiffs claim that in order to avoid the loss of their board certification, Plaintiffs and AOA board certified DOs have been forced to purchase AOA membership even though it serves no purpose with respect to, and has no actual connection with, AOA board certification or their practice as physicians ("Challenged Rule").

Plaintiffs further claim that the AOA's unlawful tying arrangement has reduced the number of DOs willing to purchase membership in other professional physician associations and has

---

[1] The allegations set forth herein are incorporated from the Court's June 12, 2017 Opinion, which denied Defendant's motion to dismiss.  (Docket No. 29.)  That Opinion also contains detailed information on the AOA board certification process.

thereby foreclosed competition in the market for membership in professional physician associations (the "Association Membership Market" or "AMM"). Plaintiffs claim that the reduction in purchases by AOA board certified DOs of non-AOA professional physician association memberships has erected barriers to entry, and thus has prevented potential rivals to the AOA from entering the Association Membership Market. In addition, Plaintiffs claim that the AOA's unlawful tying arrangement has raised the costs faced by its existing rivals, as well as softened price competition between the AOA and its existing rivals.

By reducing competition in the Association Membership Market through its unlawful tying arrangement, Plaintiffs claim that the AOA has been able to increase the price of its annual membership dues to almost double the price that its competitors in the Association Membership Market charge for membership in their associations, and there has been a corresponding reduction in competitive offerings.[2] Plaintiffs further claim that there is no evidence that the AOA's tying arrangement enhances the

---

[2] Plaintiffs claim that the AOA's annual regular membership dues presently are $683 per year, and it is estimated that the AOA is receiving more than $20,000,000 per year by unlawfully forcing AOA membership on Plaintiffs and AOA board certified DOs under the threat of invalidating prior board certifications. In contrast, Plaintiffs allege, other physician associations that provide the same benefits as the AOA membership charge between $350 and $525 per year.

efficiency of its product offerings, meaning there is no pro-competitive business justification for its unlawful tying arrangement.[3]

In addition to the tying arrangement, Plaintiffs claim that DOs who received their AOA board certification prior to 2000 were promised by the AOA that it was a "lifetime" certification that would never expire, and that promise was renewed in 2013, when the AOA initiated its Osteopathic Continuous Certification program ("OCC"). Plaintiffs claim, however, that the AOA knowingly concealed that lifetime certification holders would also have to purchase annual membership in the AOA to avoid the invalidation and cancellation of their prior "lifetime" certifications.

Based on the foregoing, Plaintiffs, on their own behalf and on behalf of the Class and Sub-Classes, have brought the present action to obtain injunctive and monetary relief against the AOA for this alleged anticompetitive tying arrangement, alleging that it violates Section 1 of the Sherman Act, 15 U.S.C. § 1 ("Section 1") and Section 3 of the New Jersey Antitrust Act

---

[3] Plaintiffs allege that the services provided by the AOA membership are the same as other medical professional associations. The benefits include continuing medical education courses, networking opportunities, information about advances in medicine, billing resources, and volume discount arrangements for things like auto insurance, car rentals, personal credit cards, and certain physician related services.

("NJAA"), N.J.S.A. 56:9-3 ("Section 3"), and the New Jersey

Consumer Fraud Act ("NJCFA") N.J.S.A. 56:8-1, et. seq.

The AOA denies that its policies violate the federal or

state antitrust laws in that it does not suppress competition in

any relevant market.  The AOA further denies that any statements

or omissions by it were fraudulent or otherwise in violation of

law.

After the Court denied the AOA's motion to dismiss

Plaintiffs' Amended Complaint on June 12, 2018, the parties

relate that it became apparent to them that this action, unless

settled, would be exceedingly costly for both sides and the

outcome uncertain.  Accordingly, pursuant to a September 27,

2017 Order issued by Magistrate Judge Joel Schneider, the

parties entered into settlement negotiations mediated by Judge

Schneider.  Those negotiations spanned a period of approximately

four months, from October 2017 to February 2018.  They concluded

with an agreement in principle on substantive terms.

Thereafter, in mid-March 2018, the parties negotiated and

agreed on the amount of attorneys' fees, costs, and service

awards that may, subject to Court approval, be awarded to Class

Counsel and the Class Representatives.  On May 7, 2018, the

AOA's Board of Trustees ("BOT") passed a resolution approving

the settlement, in June 2018 the parties entered into the

Settlement Agreement, and on July 22, 2018, the AOA House of
Delegates ("HOD") agreed to the dues decrease outlined in the
Settlement Agreement.

In their present motion, Plaintiffs and the Defendant
assert that they believe that the settlement is fair,
reasonable, and adequate.  They argue that if approved, it will
provide significant benefits to the Settlement Class and Sub-
Classes.  According to Plaintiffs' calculation, the total net
present value of the settlement exceeds $84,000,000, and the
value to each class member is at least $1,750.  The settlement
agreement provides various benefits to members of the class,
including the permanent rescission of the Challenged Rule in
exchange for dismissal with prejudice of Plaintiffs' claims
against the AOA and a release of all claims that were brought or
could have been brought by members of the Settlement Class and
Sub-Classes, including any claims for damages.  The settlement
relieves the AOA of the massive potential costs of litigation of
this case and of other cases that might be brought by members of
the Settlement Class or Sub-Classes.  The parties argue that the
Settlement Class and Sub-Classes satisfy the requirements for
class certification under Fed. R. Civ. P. 23(a) and (b)(2), and
that the settlement satisfies all relevant factors under Girsh
v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975).  Plaintiffs further

contend that their negotiated attorneys' fees and service awards to the named Plaintiffs are also fair and reasonable.

On July 25, 2018, this Court entered an Order preliminarily certifying the class. (Docket No. 89.) That Order set various deadlines for class notice and objections, among other filing deadlines. The Order scheduled the fairness hearing for November 9, 2018.

On October 29, 2018, as the time to file objections to the settlement was about to expire, the Attorneys General of Arizona, Idaho, Louisiana, Rhode Island, and Texas filed a Motion for Leave to Appear Amicus Curiae and File a Brief of Amici Curiae in opposition to the settlement approval.[4] (Docket No. 93, 94.) They, along with the appropriate state officials for the other states, as well as the appropriate federal official, were provided notice of the class action settlement pursuant to 28 U.S.C. § 1715. The purpose of that statute is to enable state and federal officials to voice concerns if they believe that the class action settlement is not in the best interest of their citizens, to provide a check against inequitable settlements, and to deter collusion between class counsel and defendants to craft settlements that do not benefit

---

[4] It is not clear how many class members are from these states. The AOA is based in Illinois.

the injured parties.  S. Rep. No. 109-14, 2005 U.S.C.C.A.N. 3.

These five states' Attorneys General argue that the
settlement is structured in a way that directly conflicts with
the United States Supreme Court's guidance in <u>Wal-Mart Stores
Inc. v. Dukes</u>, 564 U.S. 338 (2011).  In that case, the Supreme
Court held that "individualized" damages claims could not be
certified under Rule 23(b)(2) because classes certified under
23(b)(2) are "mandatory" and do not provide class members with
the right to opt-out of the Settlement Class.  The Attorneys
General argue that even though the proposed settlement awards
class members an array of prospective relief, it does so
while not only releasing class members' claims for injunctive
relief, but also certifying and releasing class members' claims
for monetary relief.  Since, Amici argued, those claims are
plainly individualized due to the nature of the antitrust claims
in this case this Court may not approve this settlement and
certify the class without violating the rule set out in <u>Dukes</u>.[5]

At the fairness hearing on November 9, 2018, the Court
granted the Attorneys General's motion to file their amicus

---

[5] In its most recent decisions citing <u>Wal-Mart Stores Inc. v.
Dukes</u>, 564 U.S. 338 (2011), the Third Circuit refers to it as
"<u>Dukes</u>."  <u>See, e.g.</u>, <u>Mielo v. Steak 'n Shake Operations, Inc.</u>,
897 F.3d 467, 483 (3d Cir. 2018); <u>Gonzalez v. Corning</u>, 885 F.3d
186, 200 (3d Cir. 2018).  This Court will refer to the case in
the same way.

brief.  The Court also heard argument on the parties' positions.[6]
In addition to articulating why their settlement is not
violative of Dukes, Plaintiffs and AOA argued that the Attorneys
General lack standing to object to the settlement as they have
not formally intervened as parties.

The Court provided Plaintiffs and the AOA the opportunity
to file supplemental briefs in response to the Attorneys

---

[6] The Court also heard from an AOA member, Paul Rossi, DO, who
filed a letter with the Court on October 24, 2018 and indicated
in his letter that he would appear at the November 9, 2018
hearing.  (Docket No. 92.)  Dr. Rossi appeared at the hearing
and told this Court that he did not object to the settlement,
and he did not feel that the settlement would harm him or other
members of the class.  Dr. Rossi stated that his primary purpose
was for the record to reflect his contention that certain
allegations in Plaintiffs' complaint as they pertained to his
particular situation were inaccurate.  In particular, Dr. Rossi
who under questioning from the Court described himself as
nothing other than an ordinary member of the AOA and otherwise
not affiliated with the Defendant, its counsel or its
management, disputed the factual accuracy of the Plaintiffs'
core contentions.  More specifically, Dr. Rossi had no objection
to the AOA's certification process, the relationship of the
process to the amount of his dues, and sharply disputed the
claim that his dues were inflated when compared to other
professional organizations he belonged to and that his AOA dues
in any way discouraged or chilled those other memberships.  Dr.
Rossi is clearly not an "objector" to this settlement in any
traditional sense.  On the contrary, as the only non-plaintiff
member of the AOA to comment on the settlement, his factual
assertions highlight the difficulty Plaintiffs faced in proving
their claims and, in light of that difficulty, the extraordinary
relief to AOA members the settlement would nonetheless achieve.
In stark contrast stands the Amici, who claim to assert the
rights of members of a sub-class but who have not produced a
single sub-class member who objects to the settlement.

General, as well as permitted the Attorneys General to file a brief reply.  All parties filed their supplemental submissions, which the Court has considered.[7]

The Plaintiffs and AOA's Motion for Final Approval of Certification of Settlement Class and Sub-Classes and Class Settlement is now ripe for resolution.  As detailed below, because the Court finds that the parties' settlement does not present the same concerns voiced by the Supreme Court in <u>Wal-Mart v. Dukes</u>, the Court will approve the Settlement Class pursuant to Federal Civil Procedure Rule 23(b)(2).

<u>**DISCUSSION**</u>

I.  <u>**Subject matter jurisdiction**</u>

This Court has jurisdiction over Plaintiffs' federal claims under 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

II.  <u>**The Settlement**</u>

A.  **The Settlement Class and Sub-Classes**

The Settlement Class is defined as:

---

[7] As discussed below, because the Attorneys General are not parties to the case or sought to intervene, the Court does not consider their submissions as an opposition or objection to the class action certification and settlement approval per se. Instead, the Court views the Attorneys General's position as offering to assist the Court in its independent analysis of whether Rule 23(b)(2) is the appropriate vehicle for the class certification and settlement of this case.

> All persons who were members of the AOA
> (regardless of membership category) and
> all persons or entities who paid dues on
> behalf of anyone who was a member of the
> AOA at any time since August 1, 2012.

The Settlement Sub-Classes are comprised of: (i) an "AOA Board-Certified Sub-Class" comprised of all members of the Settlement Class that have held AOA Board certifications since August 1, 2012; and (ii) a "Lifetime Sub-Class" comprised of all members of the Settlement Class who received "lifetime" board certification (collectively, the "Settlement Class and Sub-Classes").

## B.    Injunctive Relief and the Settlement's Value

The parties have agreed to the following injunctive relief:

- Rescission of the Challenged Rule: No later than the Effective Date (as defined in the Settlement Agreement), the AOA shall permanently decouple AOA Board certification from membership in the AOA, such that, as of the Effective Date, AOA Board certification shall no longer be conditioned upon membership in the AOA;

- Suspension of Board Certification Maintenance Fee: The AOA shall, for the period from June 1, 2019 through May 31, 2022, terminate the Certification Maintenance Fee (currently $90) that the AOA currently charges AOA Board-certified DOs - with AOA having the right to reinstate a Certification Maintenance Fee at any time after May 31, 2022, if so determined by the AOA HOD;

- <u>Dues Reduction</u>: The AOA BOT shall recommend to the AOA HOD that the HOD approve[8] (1) a $90 reduction in the annual membership dues for Annual Regular Membership, which is currently $683 for the period from June 1, 2019 through May 31, 2020; and (2) a resolution that the Annual Regular Membership dues will not be increased over that reduced amount for the period from June 1, 2020 through May 31, 2022, provided that, assuming that the HOD accepts this recommendation, the level of Annual Regular Membership dues beginning June 1, 2022 shall be determined by the HOD, in accordance with the AOA's Constitution and Bylaws;

- <u>Lifetime Certification Holders</u>: The AOA will not require Board-certified DOs who received "lifetime" Board certification to participate in Osteopathic Continuous Certification ("OCC") or to remain members of the AOA. However, to maintain lifetime certification, a DO will continue to be required to maintain a license to practice in good standing in the state or other jurisdiction in which the physician practices, satisfy specialty specific Continuing Medical Education requirements identified by the certifying Board, and not be cited for unethical or unlawful conduct. Lifetime certificants who choose not to participate in OCC can claim to be certified but cannot hold themselves out as recertified or as otherwise participating in continuing certification;

- <u>Continuing Medical Education ("CME")</u>: The AOA shall, for the period from January 1, 2019 through December 31, 2021, make available to all AOA members who purchase Annual Regular Membership two courses from the online CME programming on a complimentary basis, subject to an aggregate maximum of 12 CME credits each calendar year;

---

[8] The HOD approved the dues reduction and resolution set forth in this settlement term on July 22, 2018.

- <u>CME Acceptance for AOA Membership</u>: The AOA shall recognize accredited CME whether taken in person or online, for purposes of maintaining membership in the AOA. The AOA shall not adopt membership requirements based on the number of CME credits that may be taken online versus the number of CME credits that must be taken in person. However, the AOA and AOA specialty Boards may lawfully set and enforce requirements for the number and nature of CME credits that must be obtained to maintain AOA Board certification;

- <u>No Enforcement of CME Requirements for Non-Board Certified DO Members</u>: The AOA may maintain CME requirements as aspirational goals for members. However, physicians will not lose membership in the AOA as a result of failing to meet the CME requirement, provided that the physicians meet the CME requirements for the state(s) in which they practice;

- <u>Osteopathic Awareness Campaign Expenditures</u>: The AOA shall, for the June 1, 2019-2020 and June 1, 2020-2021 Fiscal Years, provide funding of not less than $2 million per fiscal year for the D.O. Osteopathic Physician Brand Awareness Campaign, which refers to the campaign to take "osteopathic medicine to a wide audience," described in detail on the AOA's website at: http://www.osteopathic.org/inside-aoa/about/Pages/doctors-that-DO- campaign.aspx;

- <u>Establishment of Independent/Private Practice DO Task Force</u>: The AOA shall establish a task force comprised of between five and seven members consisting of independent private practice DOs or DOs who practice in an independent private practice DO group, all of whom are engaged in direct patient care. The membership of this task force will be determined at the sole discretion of the AOA Board of Trustees as long as the members meet the above qualifications. The task force will be treated like any other task force of the AOA. This task force shall be established for a minimum of three years.

- <u>Costs of Notice</u>. The AOA shall bear the costs relating to notice to the Settlement Class and Sub-Classes.[9]

The parties contend that a number of the settlement's terms have a quantifiable economic value, such as: (i) waiver of the $90 board certification fee for approximately 33,000 AOA board certified DOs for three years; (2) the $90 reduction in the dues amount from $683 to $593 for all of the approximately 28,000 regular-level AOA members, including AOA board certified DOs, and a freeze of the dues at the reduced amount for three years; (3) the two continuing medical education courses of up to 12 credits total for all regular AOA members for three years; and (4) the $2,000,000 contribution to an osteopathic brand awareness program each year for two years.

For each of the years in which the above economic terms apply, the net present values of the package they comprise, assuming a modest 3% decline in AOA membership resulting from the elimination of the Challenged Rule and assuming each CME credit costs $75, are as follows:

Year 1:   $31,388,060

Year 2:   $28,534,600

Year 3:   $24,287,652

---

[9] The AOA has already borne the cost of Notice.

The total net present value of the settlement from years one to three is $31,388,060, $59,922,660 and $84,210,312.

The parties further contend that the non-monetary terms of the settlement also provide meaningful benefits to the Settlement Class and Sub-Classes, including several terms that will save the members of the Settlement Class and Sub-Classes time and money. In particular, by eliminating the requirement that members attend in-person CME, the settlement provision provides cost and time savings. Moreover, the establishment of a task force consisting of independent private practice DOs will improve the AOA by ensuring that all viewpoints of AOA membership are heard.

### C. Dismissal with Prejudice and Release of Claims

In exchange for the above benefits, the settlement provides for the dismissal with prejudice of the claims asserted in this action, and that all members of the Settlement Class and Sub-Classes will fully release the AOA from all federal and state law claims, including claims for damages, that could have been asserted in this action, including but not limited to claims that result from, relate to, or arise out of (i) the Challenged Rule, and (ii) any alleged or actual misstatements or omissions concerning the "lifetime" nature of the AOA Board certifications originally characterized as "lifetime" certification. The

release does not, however, include claims against the AOA that are completely unrelated to the Released Claims.

**D.    Attorneys' Fees and Incentive Awards**

The Settlement Agreement provides for an award of attorneys' fees and costs to Plaintiffs' counsel in an amount not to exceed $2,617,000, and provides for incentive fees of up to $15,000 to be awarded to each of the Class Representatives, which incentive fees are to be paid from the amount of attorneys' fees awarded.[10]

**E.    Class Notice**

Pursuant to the Court's July 25, 2018 Preliminary Approval Order authorizing the AOA to issue the Notice of Class Certification (the "Notice") to the proposed Settlement Class and Sub-Classes, the AOA retained Rust Consulting, Inc. ("Rust Consulting") a professional services administrator to administer notice in accordance with the Preliminary Approval Order. Rust Consulting sent the Notice to 99,393 potential members of the Settlement Class and Sub-Classes via electronic mail. Rust Consulting also sent the Notice to 9,462 potential members of the Settlement Class and Sub-Classes via U.S. Mail. The Notice

---

[10] The attorneys' fees and incentive awards are subject to Court approval, which Class Counsel has requested in its separate motion for fees and incentive awards. (Docket No. 91.)

was also mailed to the 3,960 individuals to whom Rust
Consulting's email notice was returned as undeliverable, or
identified as no longer valid.  Rust Consulting also established
a Settlement Website at www.membershipfeesettlement.com.  As of
September 9, 2018, there were 1,509 visits to the Settlement
Website from 1,242 unique visitors, and as of September 11,
2018, Rust Consulting had not received any objections to the
proposed settlement.

### F.    Objections

The Preliminary Approval Order ordered that "Objections to
the Settlement and/or to the application for attorneys' fees
and service awards must be electronically filed with the Court,
or mailed to the Clerk of Court, with a copy to Class Counsel
and AOA's counsel."  (Docket No. 89, ¶ 16(a).)  The Order
required all objections to be electronically filed or
postmarked "no later than 95 days after the entry of this
Order."  The Order was entered on July 25, 2018, and set the
final deadline for objections as October 29, 2018.  No
objections by any class members have been filed with the
Court.[11]

---

[11] See, *supra*, note 6.

### III.  **Class Certification**

The class action is "an exception to the usual rule that
litigation is conducted by and on behalf of the individual named
parties only," and "to justify a departure from that rule, a
class representative must be part of the class and possess the
same interest and suffer the same injury as the class members."
Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 348 (2011)
(citations omitted).

Class certification is governed by Federal Rule of Civil
Procedure 23.  Under Rule 23(a), the party seeking certification
must demonstrate: (1) the class is so numerous that joinder of
all members is impracticable, (2) there are questions of law or
fact common to the class, (3) the claims or defenses of the
representative parties are typical of the claims or defenses of
the class, and (4) the representative parties will fairly and
adequately protect the interests of the class.  Fed. R. Civ. P.
23(a).  The proposed class must also satisfy at least one of the
three requirements listed in Rule 23(b).  Fed. R. Civ. P. 23(b).
A plaintiff wishing to bring a class action lawsuit has the
burden of establishing the Rule 23(a) requirements and one of
the Rule 23(b) categories.  Mielo v. Steak 'n Shake Operations,
Inc., 897 F.3d 467, 482 (3d Cir. 2018).

In this case, Plaintiffs and the AOA contend that the

19

Settlement Class and the Sub-Classes meet the requirements of Rule 23(a). They seek to certify their class under Rule 23(b)(2), which provides that a class action may be maintained if Rule 23(a) is satisfied and if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). The Court will address Rule 23(a) and Rule 23(b)(2) in turn.

**A.    The requirements of Rule 23(a)**

**1.    Numerosity**

Rule 23(a)(1) requires that the proposed class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). In the Third Circuit, there is no minimum number of plaintiffs to maintain a suit as a class action, and a plaintiff can generally satisfy the numerosity requirement by establishing that the potential number of plaintiffs exceeds 40. Mielo, 897 F.3d at 486.

The parties represent that there are approximately 48,000 members of the AOA, 32,000 AOA Board certified DOs, and thousands of "lifetime" certificate holders. It is evident that joinder of the members of the Settlement Class and Sub-Classes would be impractical, and the numerosity requirement of Rule

23(a)(1) is satisfied.

### 2. Commonality

Rule 23(a)(2) requires Plaintiffs to demonstrate that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality requires the plaintiff to demonstrate that the class members "have suffered the same injury." Dukes, 564 U.S. at 349–50 (citation omitted). "What matters to class certification is not the raising of common 'questions' – even in droves – but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." Id. (citation and alterations omitted).

Plaintiffs' claims present the following issues common to the proposed Settlement Class and Sub-Classes:

- Whether the DO Board Certification Market and the AMM are separate product markets;

- Whether, during the relevant period, the AOA had market power in the DO Board Certification Market;

- Whether, during the relevant period, the AOA exploited its market power in the DO Board Certification Market with the Challenged Rule;

- Whether the Challenged Rule affected a substantial amount of interstate commerce or

21

commerce in New Jersey;

- Whether the Challenged Rule caused anticompetitive effects nationally or in New Jersey;

- Whether there were any pro-competitive justifications for the Challenged Rule;

- Whether the AOA misrepresented the "lifetime" nature of the AOA Board certifications originally granted as such; and

- Whether the AOA's conduct violated Section 1 of the Sherman Act, Section 3 of the New Jersey Antitrust Act, and the New Jersey Consumer Fraud Act.

The answers to these common questions are the same for all the Settlement Class and Sub-Class, respectively. Thus, the commonality prong of Rule 23(a) has been met.

### 3. Typicality

Rule 23(a)(3) requires that the class representatives' claims be "typical of the claims ... of the class." Fed. R. Civ. P. 23(a)(3). This "ensures the interests of the class and the class representatives are aligned so that the latter will work to benefit the entire class through the pursuit of their own goals." In re National Football League Players Concussion Injury Litigation, 821 F.3d 410, 427–28 (3d Cir. 2016) (quotation and citations omitted). The Third Circuit has set a "low threshold" for typicality, and "[e]ven relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of

legal theories or where the claim arises from the same practice or course of conduct." Id. at 428 (citations omitted).

The representative Plaintiffs purchased AOA memberships, have AOA Board certifications, and two of the Plaintiffs - Dr. Talone and Dr. Renza - have "lifetime" certification. Thus, Plaintiffs assert legal claims on behalf of themselves that are sufficiently typical of the claims of all members of the Settlement Class and Sub-Classes. These similarities satisfy Rule 23(a)(3)'s typicality requirement.

### 4. Adequacy of Representation

Rule 23(a)(4) requires class representatives to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement "tests the qualifications of class counsel and the class representatives," and it "also aims to root out conflicts of interest within the class to ensure that all class members are fairly represented in the negotiations." In re National Football League Players Concussion Injury Litigation, 821 F.3d at 428.

Additionally, when examining Settlement Classes, a court must assure that class counsel has: (1) possessed adequate experience; (2) vigorously prosecuted the action; and (3) acted at arm's length from the defendant. Id. (citations omitted). Rule 23(g) also provides a non-exhaustive list of factors to

23

consider, including counsel's work in the pending class action, experience in handling class actions or other complex litigation, knowledge of the applicable law, and the resources available for representing the class. Id. (citing Fed. R. Civ. P. 23(g)).

There has been no showing that any conflicts exist between the Class Representatives and the proposed Settlement Class and Sub-Classes. There also has been no reasons presented to doubt that Class Counsel are experienced class action litigators familiar with the legal and factual issues involved in this action, and each is highly qualified. Thus, the adequacy prong of Rule 23(a)(4) has been met.

### B. The requirements of Rule 23(b)(2)

Rule 23(b)(2) "applies only when a single injunction or declaratory judgment would provide relief to each member of the class." Dukes, 564 U.S. at 360. It does not authorize class certification (1) "when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant," and (2) "when each class member would be entitled to an individualized award of monetary damages." Id. In contrast to Rule 23(b)(3),[12] Rule 23(b)(2) provides no

---

[12] Rule 23(b)(3) provides that a class action may be maintained if Rule 23(a) is satisfied and if:

opportunity for class members to opt out, and it "does not even

oblige the District Court to afford them notice of the action."

Id. at 362 (explaining that a Rule 23(b)(3) class "is not

mandatory; class members are entitled to receive the best notice

that is practicable under the circumstances and to withdraw from

the class at their option" (quotations and citations omitted)).

Additionally, unlike a Rule 23(b)(3) class, "[w]hen a [Rule

23(b)(2)] class seeks an indivisible injunction benefitting all

its members at once, there is no reason to undertake a case-

specific inquiry into whether class issues predominate or

whether class action is a superior method of adjudicating the

---

(3) the court finds that the questions of law or fact
common to class members predominate over any questions
affecting only individual members, and that a class action
is superior to other available methods for fairly and
efficiently adjudicating the controversy.  The matters
pertinent to these findings include:

> (A) the class members' interests in individually
> controlling the prosecution or defense of separate
> actions;
>
> (B) the extent and nature of any litigation concerning
> the controversy already begun by or against class
> members;
>
> (C) the desirability or undesirability of
> concentrating the litigation of the claims in the
> particular forum; and
>
> (D) the likely difficulties in managing a class
> action.

Fed. R. Civ. P. 23(b)(3).

dispute.  Predominance and superiority are self-evident."  _Id._
at 362-63.

In this case, Plaintiffs and the AOA contend that
certification under Rule 23(b)(2) is the proper course.
Plaintiffs argue that each and every one of the settlement terms
agreed to by the Class Representatives and the AOA satisfy Rule
23(b)(2) because they constitute injunctive relief that will
apply equally to the members of the Settlement Class and Sub-
Classes, the situation for which Rule 23(b)(2) was precisely
crafted.

As the Supreme Court instructed in _Dukes_, "[t]he key to the
(b)(2) class is the indivisible nature of the injunctive or
declaratory remedy warranted – the notion that the conduct is
such that it can be enjoined or declared unlawful only as to all
of the class members or as to none of them."  _Id._ at 360
(citation and quotations omitted).  There, the Supreme Court
found that the certification of a class of Wal-Mart employees
regarding their claims for backpay was improperly certified
under Rule 23(b)(2).  _Id._  The Supreme Court held that in a
class action predominantly for money damages, the absence of
notice and opt-out for a Rule 23(b)(2) class certification
violates due process, and therefore individualized monetary
claims belong in Rule 23(b)(3).  _Id._ at 362.

The Dukes Court rejected the plaintiffs' argument that even though they advanced monetary claims, their request for injunctive relief predominated over their claims for money, and due to the "predominance" of their injunctive relief, Rule 23(b)(2) could be properly utilized for class certification. Id. at 363-64. The Supreme Court explained why that argument had no merit:

> In this case, for example, the named plaintiffs declined to include employees' claims for compensatory damages in their complaint. That strategy of including only backpay claims made it more likely that monetary relief would not "predominate." But it also created the possibility (if the predominance test were correct) that individual class members' compensatory-damages claims would be precluded by litigation they had no power to hold themselves apart from. If it were determined, for example, that a particular class member is not entitled to backpay because her denial of increased pay or a promotion was not the product of discrimination, that employee might be collaterally estopped from independently seeking compensatory damages based on that same denial. That possibility underscores the need for plaintiffs with individual monetary claims to decide for themselves whether to tie their fates to the class representatives' or go it alone - a choice Rule 23(b)(2) does not ensure that they have.

Id. at 364. The Supreme Court further explained that Wal-Mart was entitled to individualized determinations of each employee's eligibility for backpay because Title VII includes a detailed remedial scheme, which presents a burden-shifting analysis between a plaintiff's unlawful employment practice claims and the employer's proffered legitimate business reasons for its actions. Id. at 366 (citing International Broth. of Teamsters

v. U.S., 431 U.S. 324, 335 (1977) (applying McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)). The Supreme Court concluded that "a class cannot be certified on the premise that Wal-Mart will not be entitled to litigate its statutory defenses to individual claims." Id. at 367.

The Attorneys General argue that Rule 23(b)(2) certification is not appropriate in this case for two reasons: (1) Plaintiffs' antitrust damages are individualized, and monetary damages predominate over the injunctive relief, and (2) there is an irreconcilable intra-class conflict because the retired, inactive, or non-board-seeking members no longer have a need for the injunctive relief and have large monetary damages, while the more recent board certified members have little monetary damages but have a substantial interest in maximizing injunctive relief. Both of these concerns lead to due process violations, the Attorneys General argue, because there is no ability to opt-out of the settling class and pursue their individualized monetary damage claims.

The Court is not persuaded that Rule 23(b)(2) is not the appropriate provision under which to certify this class. The relief that applies to all class members as proposed by the parties in the settlement agreement, either as to the entire Settlement Class or the two settlement Sub-Classes, consists of:

(1) the rescission of the Challenged Rule; (2) suspension of the board certification maintenance fee; (3) dues reduction; (4) no requirement that lifetime certification holders participate in OCC or remain members of the AOA; (5) complimentary CME; (6) acceptance of accredited CME whether taken in person or online; (7) no enforcement of CME requirements for non-board certified DO members; (8) AOA funding of not less than $2 million per fiscal year for the DO Osteopathic Physician Brand Awareness Campaign; and (9) an AOA-established independent/private practice DO task force.

These provisions establish the "key" to Rule 23(b)(2) certification as required by the Supreme Court in Dukes.  All of these provisions apply indivisibly to each member of the Settlement Class and the two Sub-Classes.  The settlement provisions provide that the AOA must do and not do certain things, all of which are equally applicable to all class members.

Unlike the Wal-Mart employees' claims for backpay, which were distinct to each employee based on the circumstances of Wal-Mart's discretionary employment actions and required that Wal-Mart be afforded due process to defend itself in each case, in this case the Challenged Rule as applied to all class members is uniform.  If it is violative of antitrust laws to one AOA

member, it is violative to all.  Thus, there is no need to
undertake a case-specific inquiry because it is self-evident
that a class action is a superior method of adjudicating the
dispute.

The Attorneys General are concerned about the money damages
AOA members could have obtained if the settlement were not
structured to provide prospective injunctive relief, and that
those money damages are individualized based on their years of
membership.  The Attorneys General are also concerned about the
incidental damages provided for in the settlement that go beyond
the injunction of the Challenged Rule.  The Court does not find
those concerns compelling in this case.

As noted above, notice to the states' Attorneys General is
provided under 28 U.S.C. § 1715 so that they may voice concerns
if they believe that the class action settlement is not in the
best interest of their citizens, to provide a check against
inequitable settlements, and to deter collusion between class
counsel and defendants to craft settlements that do not benefit
the injured parties.  Here, the class notice included a clear
and unequivocal statement that damage claims would be
extinguished, and not one of the more than 100,000 recipients of
the settlement notice – i.e., the "injured parties" who are all
highly educated osteopathic physicians – objected to the

settlement on grounds that the benefits of the settlement are inadequate or that extinguishing any damages claims is unfair.

Moreover, this settlement does not present concerns of collusion between a few named plaintiffs, their attorneys, and defense attorneys to resolve the case in only their best interests. What plainly distinguishes this case from <u>Dukes</u> is the nature of the relationship between the class members and the defendant. <u>Dukes</u> involved an employer and its employees, an inherently arms-length relationship that has historically been the basis for abusive conduct. Indeed, a full range of state and federal laws act to remedy violations of the rights of workers. Anti-trust laws are equally prophylactic, of course, but the Defendant in this matter is a private membership organization with significant aspects of self-regulation and governance.

Significantly, the AOA's Board of Trustees passed a resolution approving the settlement and the AOA House of Delegates agreed to the dues decrease outlined in the Settlement Agreement. Thus, the AOA's governing body, filling the essentially same shoes at the state Attorneys' General under 28 U.S.C. § 1715, agreed that the settlement was fair to itself as an organization as well as to its individual members. This is a classic case of institutional reform, for which Rule 23(b)(2) is

31

the precise vehicle. See <u>McNair v. Synapse Group, Inc.</u>, 2010 WL 4777483, at *3 (D.N.J. 2010) (citing <u>Baby Neal for & by Kanter v. Casey</u>, 43 F.3d 48, 58-59 (3d Cir. 1994) (explaining the Rule 23(b)(2) "most frequently [serves] as the vehicle for civil rights actions and other institutional reform cases that receive class action treatment"); <u>Stewart v. Abraham</u>, 275 F.3d 220, 228 (3d Cir. 2001); <u>Barnes v. Am. Tobacco Co.</u>, 161 F.3d 127, 143 n.18 (3d Cir. 1998) ("Injuries remedied through (b)(2) actions are really group, as opposed to individual injuries[;][t]he members of a(b)(2) class are generally bound together through 'preexisting or continuing legal relationships' or by some significant common trait such as race or gender.")). This Court should be loath to block the way when these physicians agree to heal themselves.

Additionally, to the extent that individual damages are required to be quantified under the settlement, the individual damages for each class member are calculated under the same formula, which is the opposite of the backpay claims in <u>Dukes</u>. For each class member here, the damages are the difference between the heretofore existing anticompetitive AOA dues price and the competitive price provided by the settlement multiplied by the number of years during the statutory period the class member paid AOA dues.

That the settlement provides for incidental relief having
monetary value beyond the injunction of the Challenged Rule does
not violative Rule 23(b)(2).  The reduction in dues,
complimentary CME, and funding of a brand awareness campaign
clearly "flow directly from liability to the class as a whole on
the claims forming the basis of the injunctive or declaratory
relief."  Allison v. Citgo Petroleum Corp., 151 F.3d 402, 415
(5th Cir. 1998) (cited in Dukes, 564 U.S. at 365-66 (finding the
incidental damages issue not relevant to the claims for backpay
because the backpay claims could not be resolved in a singular
fashion for all class members)).  The class members in this case
are automatically entitled to this relief, and such relief is
(1) "capable of computation by means of objective standards and
not dependent in any significant way on the intangible,
subjective differences of each class member's circumstances,"
and (2) does not require additional hearings to resolve the
disparate merits of each individual's case.  Id. (citations
omitted).  In short, these damages are a group remedy
incidentally flowing from the main injunctive relief – recession
of the anticompetitive Challenged Rule – and are properly within
the scope of Rule 23(b)(2) certification.

     The Attorneys General voice concerns that retired AOA
members receive no meaningful relief by the settlement.  None of

these concerns warrant withholding approval of the settlement or bar Rule 23(b)(2) certification.  First, as noted by the parties and this Court, and despite a comprehensive and targeted notice process, not a single AOA retiree objected to the settlement. Second, retirees make up only two percent of the class.  Third, under the proposed settlement retired DOs, like active DOs, are provided with access two free continuing medical education courses per year, which supports their continued interest in staying up-to-date in medicine.  They will also receive the benefit of their annual certification maintenance fee being waived.  Even though "retired," most DOs remain interested in maintaining their professional qualifications, including Board certification, so that they have the appropriate credentials to volunteer on medical missions or to access part-time and consulting work opportunities.  These retirees also benefit in equal measure by the funding of the DO Osteopathic Physician Brand Awareness Campaign, which serves to improve the professional reputations of all DOs.  Thus, the Attorneys General's concern over the settlement's effects on retirees is unfounded.

Based on the foregoing, the Court finds that certification of the Settlement Class and Sub-Classes is appropriate under Rule 23(b)(2) because the settlement presents an injunction, and

incidental relief flowing therefrom, that is uniformly
applicable to the entire class, without any need to determine an
individualized award for any class member.

## IV.   <u>Fairness of the Proposed Settlement</u>

A class action cannot be settled without the approval of
the Court and a determination that the proposed settlement is
fair, reasonable, and adequate.  <u>Halley v. Honeywell
International, Inc.</u>, 861 F.3d 481, 488 (3d Cir. 2017) (citing
Fed. R. Civ. P. 23(e), which provides that "the claims . . . of
a certified class may be settled . . . only with the court's
approval").  The ultimate decision whether to approve a proposed
settlement under this standard is left to the sound discretion
of the district court.  <u>Id.</u> (citation and quotations omitted).

In assessing the fairness of a class action settlement, a
district court should consider several factors – called the
<u>Girsh</u> factors - including:

> (1) the complexity, expense, and likely duration of the
> litigation; (2) the reaction of the class to the
> settlement; (3) the stage of the proceedings and the amount
> of discovery completed; (4) the risks of establishing
> liability; (5) the risks of establishing damages; (6) the
> risks of maintaining the class action through the trial;
> (7) the ability of the defendants to withstand a greater
> judgment; (8) the range of reasonableness of the settlement
> fund in light of the best possible recovery; and (9) the
> range of reasonableness of the settlement fund to a
> possible recovery in light of all the attendant risks of
> litigation.

Id. at 861 F.3d at 489 (quoting Girsh v. Jepson, 521 F.2d 153,

157 (3d Cir. 1975) (quotations and alterations omitted)).[13]

Where "negotiations were conducted at arms length by

experienced counsel after adequate discovery, there is a

presumption that the results of the process adequately vindicate

the interests of the absentees."  In re New Jersey Tax Sales

Certificates Antitrust Litigation, --- F. App'x ---, 2018 WL

4232057, at *2 (3d Cir. Sept. 8, 2018) (citing In re General

---

[13] The Third Circuit expanded the Girsh factors in 1998.  See In
re Prudential Ins. Co. America Sales Practice Litigation Agent
Actions, 148 F.3d 283, 323 (3d Cir. 1998) (explaining that
"since Girsh was decided in 1975, there has been a sea-change in
the nature of class actions, especially with respect to mass
torts," and "it may be useful to expand the traditional Girsh
factors to include, when appropriate," additional factors).
These additional factors include:

> [10] the maturity of the underlying substantive issues, as
> measured by experience in adjudicating individual actions,
> the development of scientific knowledge, the extent of
> discovery on the merits, and other factors that bear on the
> ability to assess the probable outcome of a trial on the
> merits of liability and individual damages; [11] the
> existence and probable outcome of claims by other classes
> and subclasses; [12] the comparison between the results
> achieved by the settlement for individual class or subclass
> members and the results achieved—or likely to be achieved—
> for other claimants; [13] whether class or subclass members
> are accorded the right to opt out of the settlement; [14]
> whether any provisions for attorneys' fees are reasonable;
> and [15] whether the procedure for processing individual
> claims under the settlement is fair and reasonable.

Prudential, 148 F.3d at 323.  The Court will not address each
Prudential factor, as they are either not relevant to this case,
or are addressed elsewhere in the Opinion.

Motors Corp. Pick-Up Truck Fuel Tank Products Liability

Litigation, 55 F.3d 768, 796 (3d Cir. 1995)). Where, however,

approval for settlement and class certification are sought

simultaneously, district courts are required to be "even more

scrupulous than usual" when examining the fairness of the

proposed settlement." Halley, 861 F.3d at 488 (quoting In re

Prudential Ins. Co. America Sales Practice Litigation Agent

Actions, 148 F.3d 283, 317 (3d Cir. 1998) (further explaining

that this is intended to "ensure that class counsel has engaged

in sustained advocacy throughout the course of the proceedings,

particularly in settlement negotiations, and has protected the

interests of all members")).

    The Court finds that the settlement satisfies the relevant

Girsh factors.

    **(1)  The complexity, expense, and likely duration of the
          litigation**

    This is a nationwide, antitrust case involving over 48,000

class members. Cases of this magnitude and subject matter

easily meet this first Girsh factor. In re Warfarin Sodium

Antitrust Litigation, 391 F.3d 516, 536 (3d Cir. 2004) (citing

Prudential, 148 F.3d at 318) ("[C]ontinuing litigation through

trial would have required additional discovery, extensive

pretrial motions addressing complex factual and legal questions,

and ultimately a complicated, lengthy trial. Moreover, it was

inevitable that post-trial motions and appeals would not only further prolong the litigation but also reduce the value of any recovery to the class. In a class action of this magnitude, which seeks to provide recovery . . . nationwide, the time and expense leading up to trial would have been significant.").

**(2)  The reaction of the class to the settlement**

The second Girsh factor "'attempts to gauge whether members of the class support the settlement.'" Id. (quoting Prudential, 148 F.3d at 318).  As noted, none of the class members has objected to the settlement.

**(3)  The stage of the proceedings and the amount of discovery completed**

The third Girsh factor "captures the degree of case development that class counsel [had] accomplished prior to settlement.  Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." Id. at 537 (quotations and citations omitted).  This litigation has proceeded for two years, Plaintiffs retained an expert economist, the parties engaged in core discovery, and interrogatories have been served, litigated over, and answered.  It is evident that both sides appreciate the merits of the case and the benefits of settling the matter rather than continuing to litigate, thus satisfying the third Girsh factor.

**(4) The risks of establishing liability**
**(5) the risks of establishing damages**

Factors four and five "survey the potential risks and rewards of proceeding to litigation in order to weigh the likelihood of success against the benefits of an immediate settlement." <u>Id.</u> (citation omitted).

Antitrust actions are complex to prosecute. <u>In re New Jersey Tax Sales Certificates Antitrust Litigation</u>, --- F. App'x --- 2018 WL 4232057, at *3 (3d Cir. 2018) (citing <u>In re Ins. Brokerage Antitrust Litig.</u>, 579 F.3d 241, 267 (3d Cir. 2009)). Previously in resolving AOA's motion to dismiss, the Court articulated AOA's challenges to Plaintiffs' claims and the elements necessary to prove Plaintiffs' claims. (Docket No. 29.) The Court found that Plaintiffs sufficiently pleaded their claims to proceed, but noted the type of substantiated proof Plaintiffs would be required to produce to support their claims. (<u>Id.</u>) It is clear that the risks to Plaintiffs in establishing liability and damages support their desire to settle their claims, and satisfy the fourth and fifth <u>Girsh</u> factors.

**(6) The risks of maintaining the class action through the trial**

The sixth <u>Girsh</u> factor measures the likelihood of obtaining and keeping a class certification if the action were to proceed to trial because "the prospects for obtaining certification have

39

a great impact on the range of recovery one can expect to reap from the class] action." In re Warfarin Sodium Antitrust Litigation, 391 F.3d at 536. A district court may decertify or modify a class at any time during the litigation if it proves to be unmanageable. Id. (citation omitted). The Court finds this factor to be neutral.

**(7) The ability of the defendants to withstand a greater judgment**[14]

The seventh Girsh factor considers "whether the defendants could withstand a judgment for an amount significantly greater than the settlement." Id. at 537-38 (quotations and citation omitted). In regard to this factor, the AOA states: "The AOA cannot afford to settle this case if opt outs are permitted. The reason is that, under the antitrust laws, a successful plaintiff is entitled to its full attorneys' fees. So it is foreseeable that enterprising attorneys may attempt to persuade members of the class to bring individual antitrust actions based on the Rule at issue in this case – seeking four years of

---

[14] The parties relate in their motion to approve the settlement that some courts have not considered the seventh, eighth, and ninth Girsh factors in Rule 23(b)(2) certifications because those factors deal with monetary issues that do not ordinarily arise in Rule 23(b)(2) certifications, which are premised on injunctive relief. (Docket No. 90-1 at 34.) Although the Court agrees with that general premise in theory, the Court finds that it is relevant and helpful to review these three factors in this case.

alleged dues overpayment, trebled – plus attorneys' fees.  The
AOA is not prepared to risk the scenario of numerous follow-on
lawsuits." (Docket No. 104 at 11.)  There is no evidence in the
record regarding AOA's financial wherewithal, but even if AOA
"could afford to pay more does not mean that it is obligated to
pay any more than what the [ ] class members are entitled to
under the theories of liability that existed at the time the
settlement was reached."  Id. at 538.  The Court, therefore,
finds this factor to support the fairness of the settlement.

> **(8)  The range of reasonableness of the settlement fund in
> light of the best possible recovery**
>
> **(9)  the range of reasonableness of the settlement fund to
> a possible recovery in light of all the attendant
> risks of litigation**

The last two Girsh factors "test two sides of the same
coin: reasonableness in light of the best possible recovery and
reasonableness in light of the risks the parties would face if
the case went to trial."  Id. (citing Prudential, 148 F.3d at
322).  "'[T]he present value of the damages plaintiffs would
likely recover if successful, appropriately discounted for the
risk of not prevailing, should be compared with the amount of
the proposed settlement.'"  Id. (quoting Prudential, 148 F.3d at
322.)

Above, the Court presented the parties' calculation of the
total net present value of the settlement from years one to

41

three: $31,388,060, $59,922,660 and $84,210,312. The value to each class member is at least $1,750. The non-monetary terms of the settlement also provide meaningful benefits to the Settlement Class and Sub-Classes, including several terms that will save the members of the Settlement Class and Sub-Classes significant time and money. Even if the members of the Settlement Class and Sub-Classes were willing to assume all of the litigation risks, the passage of time would introduce still more risks in terms of appeals and possible changes in the law that would likely make a future recovery less beneficial than a recovery today. See id. at 536. ("[I]t was inevitable that post-trial motions and appeals would not only further prolong the litigation but also reduce the value of any recovery to the class."). This settlement represents a resolution that approaches the best possible recovery. The Court agrees with the parties' position and finds that the eighth and ninth Girsh factors favor settlement.

The analysis of the Girsh factors confirms that the proposed settlement is fair, reasonable, and adequate. The Court therefore approves the settlement agreed to by the parties. See Fed. R. Civ. P. 23(e) ("The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval . . . .

If the proposal would bind class members, the court may approve

it only after a hearing and on finding that it is fair,

reasonable, and adequate.").

## V.    Motion for Attorneys' Fees and Service Awards

Under Rule 23(h), "[i]n a certified class action, the court

may award reasonable attorney's fees and nontaxable costs that

are authorized by law or by the parties' agreement."  A claim

for an award must be made by motion,[15] and it must be served on

all parties and directed to class members in a reasonable

manner.  Fed. R. Civ. P. 23(h).  Class counsel has moved for

Court approval of their attorneys' fees ($2,617,000 inclusive

of expenses) and service award ($15,000 for each class

representative).

"[A] thorough judicial review of fee applications is

required in all class action settlements."  <u>In re Warfarin</u>

<u>Sodium Antitrust Litigation</u>, 391 F.3d at 536 (quotations and

citations omitted).  The Third Circuit has explained the two

main methods for assessing attorneys' fees requests:

Attorneys' fees requests are generally assessed under one

---

[15] The motion for attorneys' fees must be filed pursuant to Rule
54(d)(2), which requires it to be: (i) filed within 14 days of
the entry of judgment; (ii) specify the grounds entitling the
movant to the award; (iii) state the amount sought; and (iv)
disclose, if the court so orders, the terms of any agreement
about fees for which the claim is made.  Fed. R. Civ. P.
54(d)(2).  Class counsel has met all of these requirements.

of two methods: the percentage-of-recovery ("POR") approach
or the lodestar scheme.  The former applies a certain
percentage to the settlement fund, while the latter
multiplies the number of hours class counsel worked on a
case by a reasonable hourly billing rate for such services.
The POR method is generally favored in common fund cases
because it allows courts to award fees from the fund in a
manner that rewards counsel for success and penalizes it
for failure.  The lodestar method, which is more commonly
utilized in statutory fee-shifting cases and where the
expected relief has a small enough monetary value that a
percentage-of-recovery method would provide inadequate
compensation, is then used to cross-check the
reasonableness of a percentage-of-recovery fee award.

Sullivan v. DB Investments, Inc., 667 F.3d 273, 330 (3d Cir.

2011) (quotations and citations omitted).[16]

In light of the largely prospective relief envisioned in

this settlement, there is no common fund from which to draw

attorneys' fees.  Accordingly, Class Counsel is seeking fees

under the lodestar method, which is appropriate in this case.

See Dungee v. Davison Design & Development Inc., 674 F. App'x

153, 156 (3d Cir. 2017) (finding that because there was no

established "common fund" from which a simple percentage could

---

[16] The POR method requires a court to consider seven factors in
assessing the reasonableness of the fee.  In re Ins. Brokerage
Antitrust Litigation, 579 F.3d 241, 279 (3d Cir. 2009)
(discussing Gunter v. Ridgewood Energy Corp., 223 F.3d 190 (3d
Cir. 2000).  The Gunter factors are not applicable to the
lodestar method.  See id.  A cross-check of the lodestar method
with the POR method reveals, however, that the requested fee
award is about 3% of the net present value of the settlement,
and typical POR fee awards are 25% - 45%.  This alone
demonstrates the reasonableness of the requested attorneys' fees
and service awards when compared to the considerable relief
obtained for the class.

be taken, the district court properly considered the lodestar
method). "The lodestar award is calculated by multiplying the
number of hours reasonably worked on a client's case by a
reasonable hourly billing rate for such services based on the
given geographical area, the nature of the services provided,
and the experience of the attorneys. The multiplier is a device
that attempts to account for the contingent nature or risk
involved in a particular case and the quality of the attorneys'
work." In re Ins. Brokerage Antitrust Litigation, 579 F.3d 241,
280 (3d Cir. 2009) (quotations and citation omitted). "The
reasonableness of the requested fee can be assessed by
calculating the lodestar multiplier, which is equal to the
proposed fee award divided by the lodestar (i.e., the product of
the total hours and the blended billing rate)," but "the
lodestar multiplier need not fall within any pre-defined range,
provided that the District Court's analysis justifies the
award." Id. (quotations and citations omitted). A district
court may rely on time summaries instead of reviewing actual
time records. Id. (citations omitted).

    Class Counsel represents that it has devoted approximately
4,418 hours to investigating and litigating this case. Applying
a blended rate of approximately $601, the lodestar is
$2,655,218.00. Class Counsel seeks $2,617,000. This results in

a slightly negative lodestar multiplier.

As Class Counsel points out, in the Third Circuit, acceptable lodestar multipliers range from 1.19 to 2.93. (Docket No. 91-1 at 13, citing cases.) Class Counsel contends that a negative lodestar is unquestionably reasonable. Even though district courts must be aware of the potential for manipulation of the lodestar and lodestar multiplier, In re Ins. Brokerage Antitrust Litigation, 579 F.3d at 285, the Court find no evidence and no other reason to believe that this is the case here.

The Court finds that the number of hours Class Counsel billed is reasonable in this antitrust case, which is complex to prosecute. See In re New Jersey Tax Sales Certificates Antitrust Litigation, 2018 WL 4232057, at *3 (affirming 2016 WL 7494259, at *2 (D.N.J. 2016) (citing In re Ins. Brokerage Antitrust Litigation, 282 F.R.D. 92, 102 (D.N.J. 2012) ("An antitrust action is a complex action to prosecute.")). The Court also finds that the blended billing rate is reasonable. Id. at *11 (affirming the blended rate of $687.84 to be reasonable for an antitrust class action settlement). The Court further finds that because (1) Class Counsel worked entirely on a contingency fee, bearing all the risks that they may never be compensated, and (2) attorneys' fees were not discussed until

46

after the substantive settlement, is further support the attorneys' fees requested are reasonable.

With regard to the proposed service awards to the named Plaintiffs, Class Counsel requests that the Court grant service awards to each of the Class Representatives in the amount of $15,000, to be paid out of the overall award of attorneys' fees and expenses. Plaintiffs relate that without the Class Representatives, there would have been no litigation and no recovery for the Settlement Class and Sub-Classes. The Class Representatives assisted counsel with the investigation of this matter, the preparation of the Complaint and Amended Complaint, provided information to support their claims, responded to discovery requests, stayed abreast of – and to varying degrees, actively participated in – the settlement negotiations, reviewed and approved the settlement terms, and each of the named Class Representatives stood ready to devote more time and effort to the matter if it had proceeded to trial. Plaintiffs argue that the requested award would help compensate the Class Representatives for expending such time and effort, as well as recognize that each helped to obtain a benefit for thousands of their fellow Settlement Class and Sub-Class members.

"Courts may grant incentive awards in class action cases to particular members of the class." In re Cendant Corp.,

Derivative Action Litigation, 232 F. Supp. 2d 327, 344 (D.N.J. 2002) (citation omitted). "An incentive payment to come from the attorneys' fees awarded to plaintiff's counsel need not be subject to intensive scrutiny, as the interests of the corporation, the public, and the defendants are not directly affected." Id. (citation omitted) (approving a $25,000 incentive award); see also Henderson v. Volvo Cars of North America, LLC, 2013 WL 1192479, at *19 (D.N.J. 2013) (citing Dewey v. Volkswagen of Am., 728 F. Supp. 2d 546, 577 (D.N.J. 2010)) (other citations omitted) (approving a total of $33,000 in incentive awards, and noting that "courts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation," particularly when the incentive awards will be paid separate from the settlement and will not reduce the recovery to any class member).

Based on Class Counsel's representation of the named Plaintiffs' participation in this case, and because the incentive awards will be funded by the attorneys' fees award the Court has determined is reasonable and will not reduce any class member's benefit of the settlement, the Court finds that the named Plaintiffs are entitled to the requested incentive awards.

Finally, as to both the requested attorneys' fees and

service awards, notice was sent to all potential members of the Settlement Class and Sub-Classes.  No objections have been filed.  This factor further supports the award of the requested attorneys' fees and service awards.

## CONCLUSION

The settlement of Plaintiffs' class action claims against the AOA meets the requirements of Rule 23(a), is appropriately certifiable under Rule 23(b)(2), and overall is fair, reasonable, and adequate under Rule 23(e).  The Court recognizes that the Arizona Attorney General, along with the Attorneys General of Idaho, Louisiana, Rhode Island, and Texas, purport to act conscientiously as *parens patriae*.  Certainly, the statutory regime Congress has put in place establishes and encourages a vital role for them in providing a check against inequitable settlements in order to protect their citizens.  28 U.S.C. § 1715.  Here, however, their efforts are seriously misguided and myopic; their ardor and zeal badly misplaced.

This is not a so-called "coupon" case where consumers receive, as a dubious remedy for a small forgotten transaction, the "right" to spend more money with the defendant while attorneys bask in the glory of a fat, vaguely extortionate, paycheck.  This is not a case of victimized employees whose damages vary dramatically because of differences in wages,

hours, and responsibilities and the varying degrees of venality
of their respective supervisors.  More generally, this is not a
settlement reflecting the tyranny of the majority or one that
reflects a neglected unrepresented minority lacking market
power.  It is not even the avoidance of the perfect defeating
the overall good.  Rather, it reflects, as Rule 23(b)(2) must,
the concrete over the ephemeral, the real over the hypothetical,
and the tangible over unfounded fears.  In this matter, all the
class members are known; are well-respected educated
professionals; the full range of transactions are recorded and
the records available; full notice was given and due process
afforded; and, putting aside for a moment the overwhelming and
beneficial prospective relief obtained, the ancillary and
incidental damages each has suffered is calculable and
quantifiable through a simple mathematical formula a child could
learn.

Still, our Amici continue in their quixotic quest to
vindicate a principle that is not offended, on behalf of their
citizens who have not complained.  And in doing so, they have
succeeded in delaying approval of the settlement, have
frustrated its orderly administration and ultimately sought to
scuttle an agreement that promised real, tangible and

substantial benefit to literally thousands of their own citizens in each of their respective states.

In the view of this Court, the proper invocation, and indeed the very definition, of *parens patriae* requires a wiser, more discreet, pragmatic and equitable application. See <u>Black's Law Dict.</u> at 1221 (9th Ed. 2009)("the state in its capacity as provider of protection to those unable to care for themselves" and "to prosecute a lawsuit on behalf of a citizen, esp. on behalf of someone who is under a legal disability to prosecute"). In sum, the Court finds that the concerns expressed by the Attorneys' General fail to warrant the denial of final certification of the Settlement Class and Sub-Classes under Rule 23(b)(2).

An appropriate Order has been entered. (Docket No. 108.)


Date: __December 3, 2018__          __s/ Noel L. Hillman__
At Camden, New Jersey          NOEL L. HILLMAN, U.S.D.J.